**M. William RABIUS, Appellant–Respondent,**

**v.**

**Larry BRANDON and Cheryl Brandon, Respondent–Appellants.**

**Nos. WD 67890, WD 67921.**

Missouri Court of Appeals, Western District.

July 1, 2008.

---

Mark D. Murphy, Overland Park, KS, for appellant-respondent.

Danne W. Webb, Kansas City, MO, for respondent-appellants.

Before VICTOR C. HOWARD, C.J., JAMES E. WELSH, and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

M. William ("Bill") Rabius appeals the trial court's judgment against him on Count II of his Petition, which alleged that Larry and Cheryl Brandon breached a settlement agreement contract. The trial court found that Mr. Rabius could not recover on this claim because it was based on an assignment that was insufficiently specific to transfer to him any legal rights of his former spouse under the Settlement Agreement. Because we find that the trial court erred in its interpretation of the assignment, we reverse and remand for further proceedings.

## I. Factual Background

In 1990, Sterling Homes, Inc. was in the business of developing residential housing. Bill Rabius and Larry Brandon were the only shareholders of Sterling, but both of their wives, Sharon Rabius and Cheryl Brandon, were an integral part of Sterling's business.

After building a number of homes, the members of Sterling decided to terminate the business. Accordingly, Bill and Sharon Rabius, along with Larry and Cheryl Brandon, entered into a Settlement Agreement on September 1, 1990, to govern the termination of Sterling's business affairs. Among other things, the Settlement Agreement deeded to Sharon Rabius three completed residential units and their corresponding debt, in order for her to sell these units. The Settlement Agreement specified how the sale proceeds should be allocated, including paying various debts, costs, expenses, interest and fees. The Settlement Agreement provided in Paragraph Seven that the Brandons would be liable for, among other things, one half of certain expenses Bill or Sharon Rabius incurred in winding up Sterling's affairs. In addition, under the Settlement Agreement the Brandons executed and delivered to Sharon Rabius an interest-bearing Promissory Note in the amount of $6,000.00.

The Rabiuses apparently incurred substantial expenses subject to Paragraph Seven which could not be recouped from the sale of the Units.[1]

In 1993, Bill and Sharon Rabius divorced. In dividing their assets, Sharon Rabius executed a written Assignment to Bill Rabius on December 15, 1993. The Assignment stated that Sharon Rabius assigned (1) "any and all of the right, title and interest I have in and to" the September 1, 1990 Promissory Note, and (2) "all of the right, title and interest I have in and to a receivable from Larry and Cheryl Brandon created in a 9/1/90 Agreement between them, myself and M. William Rabius."

On March 12, 2002, Mr. Rabius filed his Verified Petition for Damages in Jackson County Circuit Court against Larry and Cheryl Brandon. The Petition contained two counts,[2] both alleging breach of contract. Count I alleged that the Brandons had not paid the principal ($6,000.00) and interest owing under the Promissory Note. Count II alleged that the Brandons had not paid their share of Bill and Sharon Rabius's unrecouped expenses and debt owed under Paragraph Seven of the Settlement Agreement. The Petition alleged that the Brandons were liable to Mr. Rabius based in part on the contractual rights that were transferred to him by his ex-wife, Sharon, in the Assignment.

The case was tried to the court on October 3–4, 2005.[3] On December 11, 2006, the trial court issued an Amended Judgment containing detailed findings of fact and

---

1. The "Brandon Invoice," Plaintiff's Exhibit Four, is a comprehensive listing of each specific item that allegedly constitutes the debt owed by the Brandons pursuant to the Settlement Agreement. We express no view concerning the validity or recoverability of these expenses; that issue must be determined in the first instance on remand.

2. The Petition contained a third count alleging a quantum meruit theory, which Mr. Rabius dismissed before trial.

3. Although not specifically pled by Mr. Rabius prior to trial, the trial court allowed into evidence a separate invoice (referred to as the "Fickle Invoice") that supported an additional theory of recovery against the Brandons for outstanding attorneys fees incurred by Sterling. The trial court awarded judgment to Mr. Rabius on the Fickle Invoice. No issue is raised on appeal concerning this aspect of the trial court's judgment.

conclusions of law. On Count I (breach of the Promissory Note), the trial court found in Mr. Rabius' favor, and awarded him $16,019.88 plus post-judgment interest. Additionally, the trial court awarded Mr. Rabius costs, expenses and attorneys fees of $8,000.00 "for collecting and enforcing the note under Count I of Plaintiff's petition."

However, the trial court found in favor of the Brandons on Count II (breach of the Settlement Agreement). The court concluded that the Assignment of "a receivable" to Mr. Rabius "does not sufficiently identify the subject matter sought to be assigned so as to vest in [Mr. Rabius] all the rights of Sharon Rabius in and to the Settlement Agreement," and therefore "such purported assignment is ineffective and not enforceable." [4]

## II. Analysis

On appeal, Mr. Rabius argues that the trial court erred in entering judgment against him on Count II on the basis that the Assignment was insufficiently specific and thus unenforceable. The Brandons cross-appeal. They first argue that the trial court erred in entering judgment for Mr. Rabius on Count I because his claim under the Promissory Note is barred by the doctrine of laches. In their second Point the Brandons argue that the trial court erred in denying their request for costs and attorneys fees, since they were the substantially prevailing parties in the litigation as a whole.

For the reasons stated below, we reverse and remand the trial court's ruling on Count II of Mr. Rabius's Petition; the trial court's enforcement of the Promissory Note under Count I is affirmed.

### A. Mr. Rabius' Appeal

Count II of Mr. Rabius's Petition, alleging breach of the Settlement Agreement, was predicated in part on his rights pursuant to an Assignment from his ex-wife, Sharon Rabius, concerning "a receivable" owed to Sharon by the Brandons under the Sterling Settlement Agreement. The Assignment stated in full:

### ASSIGNMENT

For Value Received and pursuant to that certain "Modification of Property Settlement Agreement" date December 15, 1993, I Sharon K. Rabius, of 12737 W. 110 Terrace, Overland Park, Kansas, hereby assign transfer and set over to Maurice William Rabius, Jr. of 11204 Foster, Overland Park, Kansas, and to his successors and assigns, any and all of the right, title and interest I have in and to a *9/1/90, $6,000.00 Promissory Note from Larry and Cheryl Brandon to Sharon K. Rabius and* any and all of the right, title and interest I have in and to a *receivable from Larry and Cheryl Brandon created in a 9/1/90 Agreement between them, myself and M. William Rabius.*

(underlining original).

The trial court concluded that the Assignment did not effectively convey to Mr. Rabius his wife's right to reimbursement under Paragraph Seven of the Sterling Settlement Agreement, because the Assignment was ambiguous, and extrinsic evidence did not resolve the purported ambiguity. We disagree.

 The resolution of this appeal turns on the application of several well-settled

---

**4.** Because Mr. Rabius's evidence did not distinguish between amounts he paid himself and those paid by Sharon, based on the ineffectiveness of the Assignment the trial court concluded that Mr. Rabius had "failed to substantiate his claim for damages for the bill of items appearing on the Brandon Invoice."

principles of contract law.[5] First, "[t]he question of whether a contract is ambiguous and the interpretation of the contract itself are issues of law that are reviewed *de novo* on appeal." *Executive Bd. of Mo. Baptist Convention v. Carnahan,* 170 S.W.3d 437, 447 (Mo.App. W.D.2005)(citing *Sonoma Mgmt. Co. v. Boessen,* 70 S.W.3d 475, 479 (Mo.App. W.D.2002)).

"A contract is ambiguous when we find that 'it is reasonably susceptible to different constructions.'" *Monsanto Co. v. Garst Seed Co.,* 241 S.W.3d 401, 407 (Mo. App. E.D.2007) (*quoting J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo. banc 1973)). "'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy.'" *Ethridge v. Tierone Bank,* 226 S.W.3d 127, 131 (Mo. banc 2007) (quoting *Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007)). "'A contract is not ambiguous merely because the parties disagree as to its construction.'" *Id.* (quoting *State ex rel. Vincent v. Schneider,* 194 S.W.3d 853, 860 (Mo. banc 2006)). Instead, "'[t]he test for ambiguity is whether the disputed language is reasonably susceptible of more than one meaning when the words are given *their plain meaning* as understood by an *average* person.'" *Lacey v. State Bd. of Registration for the Healing Arts,* 131 S.W.3d 831, 839 (Mo.App. W.D.2004) (emphasis added) (quoting *Daniels Express &*

*Transfer Co. v. GMI Corp.,* 897 S.W.2d 90, 92 (Mo.App. E.D.1995)). "[C]ourts are prohibited from creating ambiguities by distorting contractual language that may otherwise be reasonably interpreted." *Care Ctr. of Kansas City v. Horton,* 173 S.W.3d 353, 355 (Mo.App. W.D.2005). Thus, we must avoid an "overly technical reading" of contractual language, because it will produce an "unlikely[ ] construction" of the agreement. *Schell v. LifeMark Hosps. of Mo.,* 92 S.W.3d 222, 229 (Mo. App. W.D.2002).

Assignments are interpreted according to their plain and ordinary meaning just as other contracts; there is no "special rule of specificity" for assignment agreements. "'No particular form of words is necessary to accomplish an assignment, so long as there appears from the circumstances an intention on the one side to assign ... and on the other side to receive.'" *Keisker v. Farmer,* 90 S.W.3d 71, 74 (Mo. banc 2002) (quoting *Farmers Ins. Co. v. Effertz,* 795 S.W.2d 424, 426 (Mo.App. W.D.1990)); *accord, Greater Kansas City Baptist & Cmty. Hosp. Ass'n, Inc. v. Businessmen's Assurance Co.,* 585 S.W.2d 118, 119 (Mo.App. W.D.1979).[6]

Finally, Missouri courts express a preference for constructions which give effect to a contract's terms; unless it cannot be avoided, language should not be interpreted to nullify contractual provisions. *Nodaway Valley Bank v. E.L.*

---

5. Although the Assignment was apparently executed in Kansas, by Kansas residents, incident to a Kansas marriage dissolution, the parties argue the case under Missouri contract law. We accordingly apply Missouri law *without further analysis.*

6. *Keisker,* on which the Brandons rely, found an ambiguity in a purported assignment based solely on the terms of the insurance policy before it. Thus, the Court found that the operative terms "transfer" and "transferred" in the policy could have referred either to an assignment or to creation of a subrogation right. 90 S.W.3d at 74. Further, the policy in *Keisker* allowed the insured to waive rights after a loss, which the Court found would be inconsistent with the assignment of those rights to the insurer. *Id.* The Court viewed these issues in light of the principle that, "[w]hen [insurance] policy language is ambiguous, it must be construed against the insurer," *id.;* that principle has no application here.

*Crawford Constr., Inc.,* 126 S.W.3d 820, 827 (Mo.App. W.D.2004) (citing *SD Invs., Inc. v. Michael–Paul, L.L.C.,* 90 S.W.3d 75, 81–82 (Mo.App. W.D.2002)). "It is preferable to attribute a reasonable meaning to each clause and harmonize all provisions, rather than leave some provisions non-functional or nonsensical." *Id.* There is a presumption in favor of a construction of a contract that will uphold its validity, if reasonably available. *Magruder Quarry & Co. v. Briscoe,* 83 S.W.3d 647, 652 (Mo. App. E.D.2002); *see also Dickemann v. Millwood Golf & Racquet Club, Inc.,* 67 S.W.3d 724, 728–29 (Mo.App. S.D.2002).

Applying these principles here, we find that the parties' intent is unambiguously expressed within the four corners of the Assignment itself. No one disputes that Mr. Rabius was assigned, pursuant to the Assignment, (1) "a receivable" (2) "from Larry and Cheryl Brandon" (3) "created in" the Settlement Agreement. In looking at the plain, ordinary meaning of the word "receivable" (and of "account receivable," for which "receivable" is a recognized short-hand), this term is sufficient to denote the amount owed by the Brandons to Sharon Rabius under Paragraph Seven of the Settlement Agreement. "Receivable" is defined simply as "[a]n amount owed." BLACK'S LAW DICTIONARY 1296 (8th ed.2004). And an "account receivable" is defined to include the entirety of a debt owed by a debtor to a creditor:

> An account reflecting a balance owed by a debtor; a debt owed by a customer to an enterprise for goods or services.— Often shortened to *receivable.*

*Id.* at 18.

■ Interpreting the Assignment to cover *all* sums owing to Sharon Rabius from the Brandons under Paragraph Seven of the Settlement Agreement is the most ordinary and natural reading of the Assignment, despite the existence of numerous individual "line items" making up that debt. For example, an individual's debt to a credit card company is properly referred to as a "receivable" in the singular, even though that debt is composed of numerous individual charges, credits, and payments; all of the various charges and offsets together produce "an amount owed," and together constitute "an account reflecting a balance owed by a debtor." Further, we find it significant that all of the amounts which Mr. Rabius seeks to recover *pre-date* the Assignment. Thus, the full amount of the "receivable" Sharon Rabius assigned had fully accrued and was calculable at the time of the Assignment. Because none of the Brandons' debt depends on events or transactions occurring *after* the Assignment, referring to this as a single "receivable" is all-the-more natural. Finally, we note that the Assignment plainly distinguishes between the Promissory Note the Brandons executed, on the one hand, and "a receivable" created by the Settlement Agreement, on the other. By creating this distinction the Rabiuses plainly referred to debt created by the Settlement Agreement which was not evidenced by an executed note payable.

Besides applying a natural, non-technical reading to the words the parties employed, our interpretation also has the virtue of giving meaning to the Assignment's provisions, rather than rendering them wholly ineffective.

The trial court found that the Assignment was "ineffective and not enforceable" because it "does not sufficiently identify the subject matter sought to be assigned so as to vest in Plaintiff all the rights of Sharon Rabius in and to the Settlement Agreement." According to the trial court, the property description was insufficiently specific because "the Settlement Agreement creates numerous receivables potentially owed to Sharon Rabius." Given the

numerous obligations to which the trial court believed the Assignment could refer, the court concluded that:

> the assignment fails to reasonably identify the particular rights assigned, and absent a showing of a clear and unconditional intent on the part of Sharon Rabius to transfer all of her right, title and interest in the Settlement Agreement to M. William Rabius, such purported assignment is ineffective and not enforceable.[7]

Apart from the obligations created under Paragraph Seven, the trial court found the Assignment ambiguous because it could potentially refer to amounts owed to Sharon Rabius under Paragraph Three. But that paragraph does not create any "receivable *from Larry and Cheryl Brandon*" to Sharon Rabius. Instead, Paragraph Three merely provides that "[t]he proceeds from the sale of the Units shall be applied in the following order of priority." While Paragraph Three gave Sharon Rabius a right to recoup certain expenditures she made on behalf of the parties' joint business enterprise *from the Units' sale proceeds*, it did not give her any right to collect money "from Larry and Cheryl

Brandon," and thus the rights created by Paragraph Three could not be the "receivable" to which the Assignment refers. Only Paragraph Seven created a right to repayment from the Brandons.

It is true that the Assignment is not a model of draftsmanship, and could have been worded with more exacting precision. We, nevertheless, conclude that the Assignment can naturally be read to give it meaning, and that the Brandons have failed to identify any *bona fide* confusion the Assignment could have engendered. The Assignment plainly identified the "receivable" to be assigned to Mr. Rabius, and effectively transferred to him the rights he seeks to enforce in Count II of his Petition. The trial court's judgment on Count II is accordingly reversed and remanded for further proceedings.[8]

## B. The Brandons' Cross–Appeal

▇ In their cross-appeal, the Brandons argue that the trial court erred in entering judgment in favor of Bill Rabius on his breach of contract claim in Count I of his Petition because this claim was barred by the doctrine of laches.[9] That

---

7. Following its determination of ambiguity, the trial court also found that the extrinsic evidence "fail[ed] to clearly evidence an intent to assign all of [Sharon's] right, title and interest in and to the various receivables created under the Settlement Agreement of September 1, 1990." As discussed in the text, however, the Assignment itself, properly construed, effectively assigns Sharon's rights against the Brandons pursuant to Paragraph Seven of the Settlement Agreement. The extrinsic evidence offered at trial is accordingly irrelevant. *Trimble v. Pracna*, 167 S.W.3d 706, 714 (Mo. banc 2005) ("[the] intent of the parties ... is determined based on the contract alone unless the contract is ambiguous"); *Klokkenga v. Carolan*, 200 S.W.3d 144, 159 (Mo.App. W.D.2006) (" 'Parole evidence cannot be used to vary or contradict the terms of an unambiguous and complete written instrument.' ").

8. Because an assignment "divests the assignor of all interest in the thing assigned, and vests the same in the assignee," *Effertz*, 795 S.W.2d at 426, Sharon Rabius has no remaining rights to the receivable created by Paragraph Seven of the Settlement Agreement, and thus there is no risk that the Brandons could be subjected to double liability. The Brandons conceded at oral argument that Sharon Rabius has made no effort to enforce any rights she purportedly retains under the Settlement Agreement, and that even if she did her claim would now be time-barred.

9. The Brandons conceded at oral argument that Mr. Rabius's claim is timely under the applicable statute of limitations. Although they asserted other defenses in their pleadings responding to Count I, the Brandons argue only laches in this appeal.

argument ignores, however, that "[l]aches is an equitable doctrine not applicable to actions at law." *G.M. Morris Boat Co., v. Bishop,* 631 S.W.2d 84, 88 (Mo.App. S.D. 1982) (citing *UAW–CIO Local # 31 Credit Union v. Royal Ins. Co.,* 594 S.W.2d 276, 281 (Mo. banc 1980)); *see also Erwin v. City of Palmyra,* 119 S.W.3d 582, 586 (Mo. App. E.D.2003) (citing *Marvin E. Nieberg Real Estate Co. v. Taylor–Morley–Simon, Inc.,* 867 S.W.2d 618, 626 (Mo.App. E.D. 1993)). The Missouri Supreme Court has long recognized "that laches is purely a creation of equity, and is only to be invoked by the defendant in a case where the plaintiff appeals to equity and seeks the enforcement of an equitable right." *Kellogg v. Moore,* 271 Mo. 189, 196 S.W. 15, 16 (1917).

Because Mr. Rabius's breach of contract claim did "not seek any affirmative equitable relief[,] ... then it is an action at law." *Erwin,* 119 S.W.3d at 587. Accordingly, laches was not a viable defense.[10]

### III. Conclusion

We reverse the trial court's judgment on Count II of Mr. Rabius's Petition, and remand for further proceedings consistent with this opinion.

All concur.

---

**10.** Because we reverse the circuit court's judgment dismissing much of Mr. Rabius's claim under the Settlement Agreement and remand for further proceedings, the Bran-

dons' argument that they were entitled to an award of attorneys fees is moot. The circuit court may choose to revisit this issue following final disposition of Mr. Rabius's claims.